**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| GOYA FOODS, INC.,<br><br>　　　　　　*Plaintiff*,<br><br>　　v.<br><br>YUCA CORP.,<br><br><br>　　　　　　*Defendant.* | Civil Action No.:<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Goya Foods, Inc. ("Plaintiff" or "Goya"), by and through its undersigned counsel, as and for its Complaint against Defendant Yuca Corp. ("Defendant" or "Yuca"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.　　This is a civil action for false advertising under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, and deceptive trade practices and tortious interference with prospective economic advantage under New Jersey statutory and common law, N.J.S.A. §§ 56:4-1, *et seq.*, arising from Defendant's false and wrongful identification and labeling of Goya's products by way of Defendant's mobile phone food and beverage rating application known as "Yuka" (the "Yuka App").

2.　　Since its founding almost 90 years ago, Goya has prided itself on the manufacture and sale of the highest quality food and beverage products, with a particular focus on the Hispanic and Latino communities. Along the way, Goya has developed a reputation for the care it places on the selection of the freshest and finest ingredients for inclusion in its products for eventual sale

1

to its consumers.  In return, Goya's consumers have come not only to appreciate, but also to expect that Goya's products will always be of the highest quality.

3.      The trust placed by Goya's consumers in Goya and its products has manifested itself into the corporate tagline that has become the company's motto, namely, "IF IT'S GOYA … IT HAS TO BE GOOD!"  This tagline has become almost synonymous with Goya, as it simultaneously touts the health attributes, wholesomeness, and integrity of Goya's products.  This tagline has also been translated in Spanish, to resonate with Goya's Spanish-speaking consumers, namely, "SI ES GOYA TIENE QUE SER BUENO!"

4.      To further promote the health attributes and overall wholesomeness of its products, Goya also uses expanded versions of its tagline, namely, "IF IT'S GOYA, IT HAS TO BE GOOD . .. AND GOOD FOR YOU!"

5.      In a fiercely competitive landscape for food and beverages companies, made even more difficult by increasingly health-conscious consumers, Goya has stood out from the pack for its commitment to the highest-quality foods and ingredients.  That commitment, however, is not just a corporate commitment, but a family one, as Goya has been a family-run company since its founding in 1936 by Don Prudencio and Carolina Unanue.  Indeed, members of the Unanue family still run the company today, and their commitment to producing the highest-quality foods is consistent and steadfast.

6.      For nearly 90 years, Goya has continued its presence and status as a brand that consumers trust to be "good," and "good for you."

7.      It is against this background, that Goya brings this lawsuit—to defend itself from false and misleading claims made by Defendant by way of its Yuka App, that seeks to mislead Goya's consumers, without support, that Goya's food and beverage products are "unhealthy."

2

8.      By and through its product rating App, available for download on smartphones and other devices, known as the Yuka App, Defendant intentionally misleads and/or deceives consumers about the health risks associated with Goya's products.  In particular, Defendant falsely identifies Goya's products as being "hazardous," "high-risk," "poor" and "bad" for consumers in the United States – either without substantiation or often with flawed or discredited substantiation. These false and misleading statements about Goya's products are not only antithetical to its mission to manufacture and sell food and beverage products that are "good for you," but are also disparaging to Goya, as well as the Unanue family, which has invested almost a century in offering only the healthiest products and ingredients.  As such, the false and/or misleading statements by Yuca are causing Goya immeasurable harm to its reputation, as well as lost sales and disillusioned customers, who are urged by Yuca to falsely accuse Goya of selling products with ingredients that are "high risk," when they are not.

9.      The harm to Goya's reputation as a result of Yuca's misrepresentations is not hypothetical: since on or about November 18, 2024, Goya has received more than five hundred emails generated by Yuca to send to customers with pre-populated text containing false or misleading statements with respect to the safety of Goya's products.  Goya continues to receive approximately five such emails per day from customers as a result of Defendant's false, misleading and deceptive advertising and related harmful business practices.

10.     Based on Defendant's misrepresentations as to the characteristics and qualities of Plaintiff's goods, consumers are likely to be deceived and misled into believing that Goya's products are "hazardous" to ingest, pose a "high-risk" to consumer health, are "poor" in quality and/or are otherwise "bad" for consumers.  For this reason, Defendant's identification, description and labeling of Goya's products via the Yuka App constitutes false advertising under the Lanham

Act 15 U.S.C. § 1051, *et seq.*, deceptive trade practices, and tortious interference with prospective economic advantage under New Jersey statutory and common law, all to the potentially irreparable harm of Goya.

## THE PARTIES

11.     Goya is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 350 County Road, Jersey City, New Jersey 07307.  Goya is a leading and premier source for authentic Latin cuisine and is the largest Hispanic-owned food company in the United States.

12.     On information and belief, Defendant Yuca Corp. is a Delaware corporation, with its principal place of business at 228 Park Ave., S PMB 97240, New York, New York 10003-1502.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction in this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) because the action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*  The Court has supplemental jurisdiction over the state law claims asserted in this action under 28 U.S.C. § 1367 because those claims are so related to the claims arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, that they form part of the same case and controversy under Article III of the United States Constitution.

14.     On information and belief, Defendant advertises and sells its products and services and conducts business throughout the United States, including to consumers in New Jersey, through, *inter alia*, advertising and selling its products via the Yuka App for iPhones and Androids, subjecting it to personal jurisdiction in the state of New Jersey.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because, on information and belief, a substantial part of the events giving rise to this action occurred and continue to occur within this district.

### GOYA'S COMMITMENT TO HEALTH AND NUTRITION

16.     Since the 1930s, Plaintiff Goya has invested billions of dollars in building its brand from a humble storefront in Manhattan's Lower East Side to what it is today:  the largest Hispanic-owned food company in the United States and a world-leading source of high-quality, healthy, authentic and affordable Latin-cuisine products.

17.     Goya itself, and through its affiliated companies, is engaged in the manufacture, distribution and sale in interstate commerce of high-quality and healthy foods, food preparation products, and beverages, among other products.  These products are sold throughout the United States almost everywhere that food and beverage products are sold, including in supermarkets, better food stores, convenience stores, mass market stores, wholesale clubs, and over the Internet.

18.     Plaintiff currently offers over 2,500 GOYA-branded Latin-cuisine products throughout the world, including, for example, spices, seasonings and marinades, beans, canned vegetables, grains, rice, cooking oils, fruit beverages, snacks, and cookies.

**A.**     ***The Enduring Significance of Healthy, Nutritious Food to Goya's Corporate Identity and Success in the United States***

19.     Dating back to Goya's founding as a small concern with just two or three employees, including its founders Prudencio and Carolina Unanue, Goya was committed to providing the family with delicious foods that contribute to a healthy lifestyle.[1]  That commitment to quality, health, and family values is still the goal of the Goya company today.

---

[1] "If It's Goya It Has to Be Good:  75 Years of History" by Guillermo A. Baralt, at 79 (2011).

20.     The selection for the highest quality ingredients begins with a rigorous selection of raw materials and a process of quality control that guarantees the great taste of each GOYA product.  Goya works with the most advanced technology in the food industry (from the production of bottles, cans, and lids) to the innovative process of manufacturing each product that bears its mark of excellence.  For almost 90 years, Goya's most reliable calling card has been the trust that consumers have placed in the company.  Along with the excellence of its products, a warm family-centered identity has been the cornerstone of the GOYA brand.[2]

21.     Since Goya's founding, Goya's high-quality and healthy products and related services for promoting health and healthy diets have been widely advertised, offered for sale and sold throughout the United States under various trademarks, including the famous trademark GOYA.

22.     As early as the 1950's, Goya has been promoting products, such as its GOYA garbanzos (or chickpeas) that are "tasty, healthful, and nourishing" and products that are able to provide the consumer with "better health and more energy." *See* Figure 1, below, and also attached as Exhibit 1.[3]

---

[2] https://www.youtube.com/watch?v=Vb31X_iNyCQ

[3] "If It's Goya It Has to Be Good:  75 Years of History" by Guillermo A. Baralt, at 112 (2011).

 

**Figure 1**

23.     Goya's own success as it grew was also a result of its providing healthy, nutritious foods.  For example, from 1975 to 1979, food stamp funds to Puerto Rico increased significantly, and with it the number of family members benefitting from the program almost doubled, from 928,000 to 1.7 million, representing some 53 percent of the island's 3.2 million residents at the time.  The expansion of the food stamp program into Puerto Rico democratized nutrition in Puerto Rico, allowing people to enjoy a more healthful diet based on meat, fish, and dairy products.  Goya's business on the island, with its rice, beans, vegetables, and other products, also benefitted from the program.

24.     During that same part of the late 1970s and into the 1980s, the United States was experiencing a boom in "ethnic" cultural cuisine.  With approximately three million Latinos in New York City, it was an attractive market for hundreds of companies, and another pillar of Goya's success and expansion at the time.  With the expansion of new competitors, Goya stayed true to its motto: "If it's Goya, it has to be good"—good in quality, taste, and service.

25.     As Goya tried to entice Americans to try its products in the face of additional competition caused by the new interest in ethnic food, the time was right thanks to the new interest in good nutrition as a road to good health.  GOYA beans were then, and are still, a flagship product of Goya, promoted as a healthful food, high in protein, fiber, minerals such as iron, calcium, potassium, and zinc and very low in calories and cholesterol.

26.     Goya also updated its advertising strategy in a clever way to meet the new interests of the American market.  Goya commissioned a television advertisement in which a homemaker, played by actress Zohra Lampert, extolled the flavor and other virtues of GOYA beans—"GOYA, Oh Boya!," she exclaimed.  The woman portrayed in this ad (with women being the main and most loyal consumers of GOYA products at the time) could have been of Greek, Puerto Rican, Spanish, Jewish or any number of other heritages.  With this ad, Goya successfully crossed national and ethnic borders and became more deeply embedded in the U.S. marketplace.

27.     This ad, and others like it at the time, promoted many kinds of beans, which, in addition to being healthful, were inexpensive.

28.     In addition to consuming Goya's beans, increasingly health conscious Americans helped drive demand and increase Goya's exports to the United States of olive oil during the 1980s. Consumers were willing to pay higher prices for olive oil with a more intense flavor—virgin and extra-virgin—and ingredients not containing cholesterol, like olive oil, were touted as helping to prevent heart disease, as the "Mediterranean diet" was beginning to be proven to lengthen lifespans.

29.     Beginning in the 1970s, Goya began to ensure it accurately labeled all its products in English; in fact, this began the period in which Goya would label all its products in both Spanish and English.  Labeling the products correctly in English was essential because, starting in the

1970s, English speakers looking for a more healthful diet had been turning to, among other foods, beans. The high nutritional value of beans was well known: they were rich in protein, vitamins, minerals, and fiber and contained no cholesterol; some experts even claimed that beans *lowered* cholesterol.

30.     The per-person consumption of beans in the United States rose from 5.5 pounds in 1989 to 7.5 in 1991, and with this Goya's total sales rose from $330 million in 1990 to $904 million by the end of the decade.[4]

31.     During the 2000s, Goya's nutritionists also made great efforts to bring to market even more nutritious products rich in protein, low in cholesterol and sodium, and high in fiber. Low-sodium beans helped reduce the risk of heart disease, certain types of cancer, and type-2 diabetes, as well as playing an important role in weight-control regimens. Goya also began marketing canned organic beans—beans grown without pesticides or genetic modifications—and it launched its Adobo Light, with 50 percent less sodium, and Sazón Natural, with less salt, in 2006.

32.     Goya has for decades been continuously offering its vast array of goods and services to U.S. consumers under its famous tagline "IF IT'S GOYA … IT HAS TO BE GOOD!" In fact, in the early 2010s, Goya executives commissioned a book to commemorate Goya's 75th anniversary—*If It's Goya It Has To Be Good: 75 Years of History*—which title calls out Goya's famous "it has to be good" tagline, touting the health attributes, wholesomeness and integrity of Goya's products. This tagline has been translated to, and is being used in, numerous languages such as the Spanish version "SI ES GOYA TIENE QUE SER BUENO!"

---

[4] From 1982 to 1992, the average yearly increase was 16 percent.

33.    Goya's enduring commitment to health and wellness is integral to its company and brand identity, and is reflected in certain of Goya's trademarks, including:

    a.    "…IF IT IS GOYA IT HAS TO BE GOOD" (U.S. Reg. No. 942,879);

    b.    "IF IT'S GOYA … IT HAS TO BE GOOD!" (U.S. Reg. No. 4,895,915);

    c.    "IF IT'S GOYA IT HAS TO BE GOOD… AND GOOD FOR YOU!" (U.S. Reg. No. 6,037,457); and

    d.    "SI ES GOYA TIENE QUE SER BUENO" (U.S. Reg. No. 5,275,484).

34.    By way of further promoting the health attributes and overall wholesomeness of its products, Goya recently started using the modified version of its tagline on product packaging, that includes the added phrase "AND GOOD FOR YOU!"  *See* Figure 2, below, and also attached as Exhibit 2.



**Figure 2**

35.    Plaintiff's use of the GOYA mark and the taglines identified above (collectively, the "GOYA Marks") to promote health and healthy lifestyles extends beyond food products.  For example, Plaintiff has continuously promoted health-and-wellness-related goods and services as part of its GOYA brand—including sponsoring First Lady Michelle Obama's critically acclaimed,

widely covered *Let's Move!* campaign, and the U.S. Department of Agriculture's *MyPlate* Initiative.

36.     The *MyPlate*, or "Mi Plato," initiative, was intended to promote a nationwide effort to encourage health and wellness in communities across the country.  Goya rolled out numerous steps to help communities enjoy healthy, tasty and affordable meals including creating brochures, posters, coupons, and cookbooks for consumers; developing educational tools for 4th through 6th grade students across the country; and printing the MiPlato icon on some of their products.[5]  *See* Figures 3 and 4, below, and also attached as Exhibits 3 and 4.





**Figure 3**                                             **Figure 4**

37.     First Lady Michelle Obama also recognized Goya's impact in the Latin community and its invaluable efforts in improving the health of its customers by stating *"[e]verything that*

---

[5]     https://obamawhitehouse.archives.gov/the-press-office/2012/01/26/first-lady-michelle-obama-joins-goya-foods-announcing-mi-plato-resources

*Goya is doing from the MiPlato posters and pamphlets to cookbooks and recipes – center around the idea that we parents can make simple changes to help their children lead healthier lives."*[6]

38.    More recently, in September 2024, the United States Department of Agriculture honored Goya with the MyPlate Partner Gold Champion Achievement Award for its commitment to promoting healthy eating and aligning its products with the U.S. Dietary Guidelines.[7]

39.    During its over 85 years of existence, Goya has produced high quality, nutritious products; low-sodium, sugar free and organic items; and healthier MyPlate recipes that keep to the culinary traditions of its Latin roots.  To continue to show its commitment, Goya launched the "85 Healthier Habits" campaign, partnering with nutrition, wellness, and fitness experts around the country who share their information about healthier lifestyles and ways to enjoy the foods consumers love.[8]

40.    In fact, Goya's website "Goya.com" includes a section on "Nutrition," both in its English and Spanish versions.  This section includes information on the "My Plate" project, popular MyPlate Recipes, Healthy Habits, and Nutritional Facts.  *See* Figure 5.1, below, and also attached as Exhibit 5.

---

[6]    https://www.cbsnews.com/miami/news/first-lady-launches-latino-healthy-eating-initiative-in-florida/

[7]https://www.facebook.com/GoyaFoods/videos/usda-honors-goya-with-the-myplate-partner-gold-champion-achievement-award/543275494750445/

[8] https://www.goya.com/en/nutrition/



**Figure 5.1**

41.     Goya's "Nutritional Facts" include videos regarding "Cultural Eating," "Meal Planning," "Wellness," "Plant-based," "Family & Fitness," "Nutrition Facts: Know Your Food," and "Healthy Cooking Techniques." *See* Figure 5.2, below, and also attached as Exhibit 5.



**Figure 5.2**

13

42.    On its YouTube channel, Goya includes videos on healthy eating with Goya and Food Scientist/Nutritionist Meriterese Racanelli, such as "Goya MyPlate for Pregnant and Nursing Moms,"[9] "Diabetes and Eating Rice,"[10] and "Healthy Eating on a Budget."[11]

43.    The Unanue family has also given multiple interviews to spread the word about Goya's focus on health and wellness for its products.  Both Bob and Peter Unanue, direct descendants of Prudencio and Carolina Unanue, have appeared on prominent news channels such as *Fox News* and *NBC News* to highlight Goya's shift in its product lines to expand on healthier products for consumers that focuses on organic super-foods.[12]  Bob and Peter Unanue both stress the importance of focusing on health and wellness at Goya, a point that has been the focus of Goya since its founding in 1936.

44.    Goya has expended, and continues to expend, hundreds of millions of dollars on advertising, marketing, and promoting the health benefits of its vast array of goods and services to consumers throughout the world under its GOYA Marks.

45.    The goods and services that Plaintiff offers under its GOYA Marks have enjoyed enormous commercial success throughout the world.  Indeed, goods and services offered under Plaintiff's GOYA Marks enjoy annual sales of upwards of $1.5 billion.

46.    Due to Goya's extensive advertising, marketing, and promotional efforts, as well as the commercial success and widespread media coverage of the Goya products identified by the GOYA Marks, consumers in the United States view Goya as an industry leader when it comes to

---

[9] https://www.youtube.com/watch?v=_E1OJfNUoFE

[10] https://www.youtube.com/watch?v=yCUeZvOOnyE

[11] http://youtube.com/watch?v=y7ny8u2CG4A

[12] "Goya Foods Health Push," < https://www.youtube.com/watch?v=wQI41Qqj3fU>, Fox News (2016); "The Family Behind the 80-Year Success of Goya Foods," <https://www.youtube.com/watch?v=xYa6UuwwfB8>, NBC News (2017).

healthy and wholesome food and beverage products.  Goya's position as a marketplace leader, in turn, generates substantial and valuable goodwill and customer loyalty.

**B.**     ***Goya's Compliance with Regulations Established by the U.S. Food & Drug Administration***

47.     In addition to the importance Goya places on the safety, health and wellness benefits of its products to its corporate identity and branding strategy, Goya ensures strict compliance with federal food safety laws governing purveyors of food in the United States by way of adhering to all applicable U.S. Food & Drug Administration ("FDA") regulations.

48.     Under the FDA's regulatory framework, any substance intentionally added to food is considered a food additive and is subject to pre-market approval by FDA, unless its use is generally recognized as safe ("GRAS").  The GRAS designation, established by Congress in 1958, applies to substances that qualified experts have "generally recognized as safe" under the conditions of their intended use, based on scientific evidence and/or a long history of common use in food.

49.     A "food additive" is "any substance the intended use of which results or may reasonably be expected to result (directly or indirectly) in its becoming a component or otherwise affecting the characteristics of any food."  21 U.S.C. §321(s).  The FDA has further explained that "food additives" are substances intentionally added to food in order to maintain or improve safety, improve or maintain nutritional value, enhance taste, improve appearance, improve texture, or preserve freshness.[13]     Food additives include "direct food additives," typically identified on ingredient labeling, or "indirect food additives," also referred to as "food contact substances,"

---

[13] "Understanding How the FDA Regulates Food Additives and GRAS Ingredients," U.S. Food & Drug Administration,          <https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/understanding-how-fda-regulates-food-additives-and-gras-ingredients> (last accessed May 14, 2025).

which may become part of a food in trace amounts due to the product's packaging, storage, or other handling.

50.     However, there are important categories of food ingredients that are exempted from the definition of "food additive," and therefore not subject to FDA's pre-market approval requirements.  A principal exemption is for a GRAS substance, which is "one that is generally recognized, among qualified experts, as having been adequately shown to be safe under the conditions of its intended use."  21 C.F.R. §170.30.

51.     GRAS substances were first exempted from the definition of "food additive" in the Food Additives Amendment of 1958, which amended the Federal Food, Drug, and Cosmetic Act. That law exempted from the definition of "food additive" any substance that is "generally recognized, among experts qualified by scientific training and experience to evaluate their safety as having been adequately shown … to be safe under the conditions of their intended use."  21 U.S.C. §201(s).  FDA first published a list of GRAS substances in the Federal Register in 1958. Those regulations are now codified in 21 C.F.R. Parts 182, 184 and 186.

52.     In the late 1960s, FDA undertook a comprehensive review of the list of GRAS substances.  To accomplish this, FDA contracted with the Life Sciences Research Office ("LSRO") of the Federation of American Societies for Experimental Biology to assess the available scientific literature and to recommend what restrictions, if any, on the use of the substances would be needed to ensure their safe use in food.

53.     Throughout the 1970s, LSRO selected qualified scientists (designated as the Select Committee on GRAS Substances ("SCOGS")) as consultants to review and evaluate the available information on each of the GRAS substances.  The Select Committee's evaluations were made independently of the FDA or any other group, governmental or nongovernmental.

54.     Continuing from the 1970's and into the 1980's, the FDA made tentative reports from SCOGS available to the public and provided opportunity for the public to appear before the Select Committee at a public hearing.  SCOGS considered the data, information, and views presented at the hearing in developing its final reports.  By 1982, SCOGS had submitted opinions to the FDA on the health aspects of more than 400 substances.

55.     After receiving a final SCOGS report, the FDA reviewed the report and related information.  When appropriate, the FDA issued a notice of proposed rulemaking to affirm GRAS recognition for substances recommended for GRAS recognition by final SCOGS reports.

56.     If, after reviewing comments to the proposal, the FDA concluded that the available data and information supported GRAS recognition, the FDA issued a final rule affirming GRAS status by amending 21 C.F.R. Part 184 (direct food ingredients) or Part 186 (indirect food substances).  Examples of GRAS substances include gums, dextrans, and various salts *(e.g.*, sodium, potassium, calcium and iron salts).

57.     The safety of GRAS substances is thus backed by scientific studies and literature reviewed by LSRO food science experts, pressure tested by public comment and debate, and only then subjected to review and ultimate approval by the FDA.  The continued presence of a GRAS substance in FDA regulations confirms the agency's affirmative view that the substance is safe to be used as a food ingredient.

58.     Goya has extensive processes in place that align with FDA regulations to ensure that only the highest-quality products reach its consumers.  For example, Goya will only purchase ingredients and additives from well-known, well-established brokers and food companies in the food industry.  Goya ensures that each supplier with which it contracts to purchase food additives adheres to strict guidelines, including: (i) meeting all regulatory requirements in the country where

17

it is located **and** the destination country; (ii) meeting all agreed-upon specifications with respect to microbiological limits, packaging materials, shelf life, traceability and quality attributes; (iii) submitting to periodic monitoring and "recertification" every three years, meaning the supplier must meet all requirements imposed upon a new supplier; and (iv) using a designated quality-control technician to confirm that all ingredients or additives received from an approved supplier match Goya's records in terms of what that supplier is authorized to provide.

59.    Goya also has a procedure in place with respect to its raw packaging material to ensure that all raw materials and pallets are visually inspected and sampled (where applicable) to ensure specification, food safety, authenticity, legality, and quality requirements are met.  These rigorous guidelines include visual inspection not only of the food products, ingredients and additives coming into Goya's facilities, but also of the trucks, railroad cars, and boxes in which the shipments are packaged.  Importantly, supervisors at Goya will visually inspect products prior to unloading to make sure that seals on closures are in place and have not been breached.  In addition to the visual inspection of seal integrity, shipments will be rejected if they are found to include any of the following: condensation/moisture, moldy products, loose debris, evidence of pest activity, abnormal odors, opened/damaged/torn cases or totes, or water damage.  When the products require sampling, Goya has a process lead by its Quality Control Department for testing the products for defects, damage, density, and moisture.  If a sampling is rejected for not satisfying the above-identified criteria, the incident is documented and further samples are taken.

60.    With respect to the color additives used by Goya, synthetic colors have an additional requirement known as batch certification.  Batch certification requires that chemical analyses be conducted to ensure the absence of impurities.  Goya ensures that all of the appropriate

analyses are conducted and that Goya receives certificates of analysis guaranteeing that its color additives are free from mold and other impurities, as required under 21 U.S.C. §§ 73-82.

61.    Thus, in addition to input from its own food scientists and nutritionists, Goya has ensured that its core values as a purveyor of healthy foods that are, in fact "good for you" are honored by complying with scientifically validated FDA regulations, particularly as it relates to the FDA's GRAS recognition for additives Goya uses in its products.

## PROCEDURAL BACKGROUND

62.    Goya first became aware of Defendant's false advertising and other deceptive trade practices on or around November 18, 2024, when Goya first received consumer complaints in the form of emails penned by Defendant, which were then sent directly to Goya's customer services email address <consumers@goya.com> by way of the "Call-Out" feature of the Yuka App.

## DEFENDANT'S WRONGFUL ACTS

A.    ***Defendant's False and Misleading Statements: the Overall Nature of Its Services***

63.    In terms of its business model, Defendant advertises on its website that it "deciphers product labels and analyzes the health impact of food products and cosmetics."  *See* Figure 6.1, below, and also attached as Exhibit 6.



**Figure 6.1**

64.      Although Defendant advertises that it "deciphers product labels" and "analyzes" the health impact of food, the fine print in Defendant's Terms and Conditions indicates that Defendant's statements are matters of mere "opinion" that may contradict relevant government regulations responsible for food health and safety.

65.      Upon information and belief, the Yuka App, available for download on iPhone and Android devices, has been downloaded by approximately 65 million users as of April 2025. According to Yuca, the app is available for download in 12 countries, with the United States being its fastest-growing market, adding nearly 600,000 new users monthly, with 25 products scanned every second.

66.      On the Yuka App, available for download on the iPhone and Android devices, Defendant falsely identifies a significant number of Goya's products as being "assessed as high-risk" and has assigned such products ratings of "poor" or "bad."

67.    Defendant's claim that it "deciphers product labels and analyzes the health impact of food products and cosmetics" is, therefore, false and misleading to consumers because the claim does not clearly state that such "analyses" are actually only opinions about Goya's products.  Also, this statement has induced, and will continue erroneously to induce, consumers into believing that Defendant is providing irrefutable facts about the health quality of certain food products, resulting in consumers' opting not to purchase products that Defendant labels as "hazardous," "high-risk," "poor" or "bad."

68.    On its website, Defendant also advertises that it "evaluate[s] the quality of your foods" and can analyze which "products are good for you and which ones you should avoid."  *See* Figure 6.2, below, and also attached as Exhibit 6.



**Figure 6.2**

69.    Defendant's representation that it will inform you of "what products are good for you" also mispresents the service that Defendant provides.  While Defendant's website indicates that it is definitively identifying healthy products, it is actually only providing an opinion as to what products Defendant believes are healthy and which ones consumers should avoid, without conspicuously acknowledging that all of the ingredients and/or additives that it rates are all compliant with all applicable federal regulations.

70.     Notwithstanding the fact that those statements are opinions, at best, Defendant's statements are intended to, and do, give consumers the impression that Defendant is providing accurate analysis about what products consumers "should avoid."

71.     A consumer's decision not to purchase Goya products based on intentionally false or misleading general representations about Defendant's services provided via the Yuka App will not only harm Goya financially, it will also cause irreparable damage to the significant consumer goodwill that Goya has cultivated for decades through the promotion of its products as being both "good" and "good for you."

72.     Indeed, as is detailed below, Defendant's actions have already misled customers away from Goya's products and have tarnished Goya's well-deserved reputation.

**B.      *Defendant's False and Misleading Statements: Specific Product Reviews***

73.     After downloading the Yuka App, consumers are able to use it to scan one of Goya's food or beverage products to receive a "score" for the product.  The "score" a certain product receives dictates whether the user should then purchase the scanned product.  As such, any "score" that Yuca assigns a product is a material representation to customers about the safety of the scanned item.

74.     For example, the below figure demonstrates the result of a scan of Goya's "Adobo with Pepper All-Purpose Seasoning" product using the Yuka App, which assigned this product a "bad" rating without disclosing the method for assigning the score.  *See* Figure 7, below, and also attached as Exhibit 7.



**Figure 7**

75. The "bad" rating assigned by Defendant is false and misleading because Defendant fails to provide any evidence that the quantity of additives in this product are harmful for human consumption—likely because none exists.

76. Defendant's rating system is also misleading because it fails to indicate that the "bad" rating relies solely on Defendant's opinion.

77. Defendant's "bad" rating is also false, or likely to mislead, as Defendant fails to disclose that the quantity of additives in this product meets applicable FDA regulations.

78. Defendant's own webpages do not make clear how it allegedly uses scientific research or conducts an independent analysis to justify its rating system.

79. For example, on Defendant's webpage titled "How are food products rated?," <https://help.yuka.io/l/en/article/ijzgfvi1jq>, Defendant references multiple sources that it purports to rely upon for its analysis. *See* Figure 8, below, and also attached as Exhibit 8.

How are food products rated?

Updated 1 month ago by Benoit

Yuka's food product scores are based on three criteria:

- **Nutritional quality is 60% of the score.**

The calculation method is based on Nutri-Score, a science-based nutrition label adopted by 7 European countries that measures the nutritional balance of food products, taking into account the indicated quantity of sugar, sodium, saturated fat, calories, protein, fiber, as well as the fruits and vegetables content (calculated or estimated).

The IARC (International Agency for Research on Cancer), a WHO agency, supports this method, highlighting its effectiveness in guiding consumers towards healthier food choices as well as its scientific relevance.

Nutri-Scores are translated into Yuka ratings as shown in the correspondence table, available here.

- **The presence of additives is 30% of the score.**

Benchmarks are based on the latest scientific research. We take into account the recommendations of the EFSA, and the IARC, in addition to numerous independent studies.

Every additive is assigned a risk level based on various existing studies: risk-free (green dot), limited risk (yellow dot), moderate risk (orange dot), high-risk (red dot).

If an additive we consider to be high-risk is present, the maximum score for the product is set at 49/100. In this situation, this criterion can represent more than 30% of the score.

Information about the risks associated with each additive, as well as the corresponding scientific sources, are available in the application.

- **The organic dimension is 10% of the score.**

This is a bonus granted to products considered organic, i.e. those with an official national or international organic label. They avoid chemical pesticides which can pose a health risk.

The health benefits that an organic diet can provide are explained here.

**Figure 8**

80.     Defendant does not explain on this webpage, or elsewhere on its website or the Yuka App, how it identifies, reviews, and applies "the latest scientific research" to assign ratings to products, nor does it explain which "scientific research" is weighted as most significant, or how it is weighed against other factors Defendant uses to form its statements of opinion, which are then likely to deceive consumers by being presented as fact.

81.     On a webpage on Defendant's website titled "What are the main scientific sources for Nutri-Score evaluation?", <https://help.yuka.io/l/en/article/4mt8nhb5fz>, Defendant lists multiple different articles and studies, several of which are reproduced below. *See* Figure 9, below, and also attached as Exhibit 9.

# *What are the main scientific sources for Nutri-Score evaluation?*

 Updated 10 months ago by Benoit

Two Dimensions of Nutritional Value: Nutri-Score and NOVA. Nutrients 2021, 13(8), 2783. Carmen Romero Ferreiro, David Lora Pablos and Agustín Gómez de la Cámara https://www.mdpi.com/2072-6643/13/8/2783/htm

Application of the British Food Standards Agency nutrient profiling system in a French food composition database. British Journal of Nutrition 112, no 10 (2014) : 1699 1705. Julia C, Kesse-Guyot E, Touvier M, Méjean C, Fezeu L, et Hercberg S. https://www.cambridge.org/core/services/aop-cambridge-core/content/view/DC2AB3C0EE6DD7A00E600E25B1A76C4F/S0007114514002761a.pdf

Performance of a five category front-of-pack labelling system–the 5-colour nutrition label–to differentiate nutritional quality of breakfast cereals in France. BMC public health 15, no 1 (2015) : 179. Julia C, Kesse-Guyot E, Ducrot P, Péneau S, Touvier M, Méjean C, et al https://bmcpublichealth.biomedcentral.com/track/pdf/10.1186/s12889-015-1522-y

Discriminating nutritional quality of foods using the 5-Color nutrition label in the French food market : consistency with nutritional recommendations. Nutrition journal 14, no 1 (2015) : 100. Julia C, Ducrot P, Péneau S, Deschamps V, Méjean C, Fézeu L, et al. https://nutritionj.biomedcentral.com/track/pdf/10.1186/s12937-015-0090-4

**Figure 9**

82.    Defendant identifies the Nutri-Score, "a rating system developed by international research teams that measures the nutritional value of food products," as part of the basis for its scoring system.[14]

83.    The Nutri-Score is not a system that is currently employed or relied upon in the United States by the FDA or other U.S. government agencies responsible for food safety.

84.    Although it identifies the Nutri-Score as part of the basis for its scoring system, Defendant fails to provide any information about what underlies the remaining analysis backing

---

[14] *See* "What is the Nutri-Score?", <https://help.yuka.io/l/en/article/fw1tjp24o4-what-is-the-nutri-score>, (last accessed April 4, 2025).

its scoring system.  For example, Defendant's website states that the "Nutri-Score calculation method has been refined in the Yuka rating" without providing further explanation on how the Nutri-Score method is "refined" by Yuca.  *See* Figure 10, below, and also attached as Exhibit 10.

## How is the Nutri-Score used to obtain the Yuka rating?

 Updated 3 months ago by Benoit

The Nutri-Score calculation method has been refined in the Yuka rating in order to:

- avoid threshold effects that could lead to significant rating differences between two products with similar nutritional values,
- prevent a product with a Nutri-Score of D or E from having a score higher than 49/100 in the Yuka rating.

**Figure 10**

85.     Defendant's failure to clearly explain to consumers how its analyses are conducted prevents consumers from understanding whether the analyses are reliable and whether the conclusions presented by Defendant should be followed in making decisions not just about their health, but about which products to purchase.

86.     When Defendant identifies a "high-risk" additive on the Yuka App, for example after scanning Goya's "Adobo with Pepper All Purpose Seasoning" product, the Yuka App provides additional information on the "high-risk" additive, and links scientific sources, reproduced below.  *See* Figures 11 and 12, below, and also attached as Exhibits 11 and 12.





**Figure 11**                                    **Figure 12**

87.    However, neither Defendant's website nor the Yuka App provide further insight into how the "scientific research" impacts Defendant's analysis. For example, it is unclear whether Defendant gives considerable weight to articles from certain publications while giving little consideration to articles from other publications.

88.    Defendant therefore intentionally misleads consumers regarding the assessments it provides. By presenting its opinions as fact, consumers are likely to believe that products that Defendant scores as "hazardous" or "high-risk" or "poor" or "bad" are harmful to consumer health, even if those products meet all applicable food and safety guidelines set by relevant federal regulatory agencies in the United States.[15]

---

[15] *See, infra*, ¶¶ 90-149 for Defendant's additional misleading behavior in the form of drafting emails for consumers to send to Goya regarding the "hazardous," "high-risk," "poor," or "bad" nature of Goya's products.

89.     As a result of Defendant's intentionally false and misleading statements regarding the additives that are in Goya's products, consumers will and, on information and belief, have stopped purchasing Goya products.  Defendant's intentionally false and misleading statements have also tarnished Goya's longstanding positive reputation in the food and beverage industry.

### C.     *The Yuka App's "Call-Out" Feature*

90.     Defendant's improper conduct does not end with its use of a rating system vis-a-vis Goya's products that falsely represents the products as "hazardous" or "high-risk" or "poor" or "bad"; Defendant takes the <u>additional damaging step of assisting consumers, by way of the "Call-Out" feature of the Yuka App, with drafting emails to Goya and posts for use with Goya's social media accounts</u> ***using Defendant's own highly-technical language*** regarding the purported risks associated with identified product additives.  The emails and posts authored by Defendant are presumed to be widely viewed and distributed, including to consumers who do not use the Yuka App and who will not, therefore, be made aware that the ratings assigned are based on Defendant's opinion or that all of the product additives at issue adhere to all applicable FDA regulations.

91.     Indeed, if Defendant identifies a product as having a "high-risk" additive, it will provide the consumer with an option to "Call-Out" the brand if the additive falls within a list that Yuca identifies as being "present in a very large number of products in the Yuka database" and therefore "particularly concerning for consumer health."[16]

92.     Yet, buried in the fine print on Defendant's "How does the Call-out feature work?" webpage, Defendant itself acknowledges that "[a]lthough these substances may be present in food at levels that comply with current regulations and are therefore considered safe by health

---

[16] *See* "How does the Call-out feature work?", < https://help.yuka.io/l/en/article/f33xjkwc6h-how-does-the-brand-call-out-feature-work>, (last accessed April 3, 2025).

authorities, Yuka's role is to alert consumers to potential health risks, even if they are still under suspicion."[17]

93.     Defendant fails to explain on its website, or the Yuka App, what scientific research it has analyzed, how the research was analyzed, or how Defendant draws conclusions regarding the assessments about the allegedly harmful additives that prompt the "Call-Out" feature.

94.     Indeed, Defendant acknowledges that "most manufacturers use additives for legitimate reasons (to extend product shelf life, improve texture, or stabilize properties)" in the fine print of "How does the Call-Out feature work?" webpage.[18]

95.     Interestingly, Defendant's "Call-Out User Policy"[19] posted on its website includes the following statement in capitalized, bold font:  "NOTE THAT BY CALLING OUT A BRAND, YOU MAY INCUR PERSONAL LIABILITY."  Defendant's acknowledgment that individuals may incur liability by using its Call-Out feature clearly serves to establish that Defendant is aware, and knows it could be liable, for the extensive harm that Goya has suffered and continues to suffer as a direct result of Defendant's false and misleading statements.

96.     Despite these acknowledgements, which Defendant buries in the fine print of disclaimers that do not appear anywhere near the consumer-focused portions of the Yuka App, Defendant intentionally misleads consumers into believing that certain additives are "high-risk" to their health, which is likely to result in consumers choosing not to purchase Goya products, ultimately harming Goya both financially and reputationally.  When viewing the product rating, the Yuka App provides a "Call-Out" feature under the allegedly high-risk additive.  As seen below

---

[17] *Id.*

[18] *Id.*

[19] "Call-out User Policy," Yuka, < https://help.yuka.io/l/en/article/i8j3coigwq/preview> (last accessed May 14, 2025).

with Goya's "Adobo with Pepper All Purpose Seasoning" product, the "Call out the brand" option appears under the "Negatives" section which lists tricalcium phosphate as a high-risk additive. *See* Figure 7, *supra*.

97.     When the consumer clicks the "call out the brand" option, it is directed to a screen that states "Ask Goya to remove high-risk additives . . . together, let's take action for the removal of high-risk additives from this product." *See* Figure 13, below, and also attached as Exhibit 13.



**Figure 13**

98.     The screen also lists the number of "consumers [that] have already called out Goya" (here purportedly 836) and a description of why the additive should be removed from the product.

99.     Notably absent from this description is an acknowledgement that the FDA has specifically recognized tricalcium phosphate as safe for human consumption when used in

accordance with good manufacturing practice.  *See* Figure 14, below, and also attached as Exhibit 14.[20]



**ECFR CONTENT**

**§ 182.1217 Calcium phosphate.**

(a) *Product.* Calcium phosphate (mono-, di-, and tribasic).

(b) *Conditions of use.* This substance is generally recognized as safe when used in accordance with good manufacturing practice.

**Figure 14**

100.    As demonstrated in Figure 14*, supra*, calcium phosphate has been classified as generally recognized as safe by the FDA.

101.    As used in Goya's "Adobo with Pepper All Purpose Seasoning" product, tricalcium phosphate is an "anticaking agent."  Tricalcium phosphate has been recognized by FDA as a GRAS substance since at least 1977, when it was included in the list of "multiple purpose GRAS food substances" in 21 C.F.R. Part 182.  As a GRAS substance, calcium phosphate has been recognized by the FDA as safe for its intended use, based on the recommendation of qualified scientists from the LSRO.  In fact, the relevant SCOGS opinion provides: "The current use of calcium phosphates in food processing is without harmful effects on the health of consumers and, in some instances, *may be advantageous*." (emphasis supplied).[21]

102.    Notwithstanding the FDA's GRAS classification of calcium phosphate, the Yuka App's "Call-Out" feature allows the consumer to send an email or to post a message directly on Goya's Instagram or LinkedIn accounts, drafted by the Defendant, that states that the product

---

[20] Code of Federal Regulations, § 182.1217 Calcium phosphate, https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-B/part-182/subpart-B/section-182.1217 (last accessed April 1, 2025).

[21] http://wayback.archiveit.org/7993/20171031063615/https://www.fda.gov/Food/IngredientsPackagingLabeling/GRAS/SCOGS/ucm260884.htm

"contains an additive assessed as high-risk" without informing the consumer that the "high-risk" designation is merely a matter of opinion on the part of the Defendant.  *See* Figure 15, below, and also attached as Exhibit 15.



**Figure 15**

103.    The draft email identified above, composed by Defendant, states that phosphorus is "a mineral whose current intake exceeds recommendations, and whose excess could disrupt bone mineralization, have a harmful effect on the kidneys, and increase the risk of cardiovascular diseases.  Additionally, it could be present in the form of nanoparticles, which may accumulate in organs."

104.    Notably absent from Defendant's description is that tricalcium phosphate has been recognized by the FDA as safe for human consumption when used in accordance with good manufacturing practices.  *See* Figure 14 and corresponding Exhibit 14.

105.    As another example, Goya received an email drafted by Defendant for its product "Coco Ounce Units"[22] that lists polyoxyethylene sorbitan monostearate and mono- and disglycerides[23] of fatty acids as "high-risk" additives.  *See* Figure 16, below, and also attached as Exhibit 16.

---

**Sent on:** Sunday, March 9, 2025 9:12:29 PM
**To:**    Consumers <Consumers@goya.com>
**CC:**    copy@inbound.yuka.io
**Subject:** Coco ounce units - Goya: Request for Removal of High-Risk Additives

[You don't often get email from marawalker99@icloud.com. Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

Hello,

I have scanned the product 041331021630 on the Yuka App. It contains several additives assessed as high risk.

- Polyoxyethylene sorbitan monostearate:
Polysorbates are suspected of significantly disrupting the gut microbiota, generating chronic inflammation in the intestine. This persistent inflammation weakens the immune system and could contribute to the onset of various chronic diseases such as type 2 diabetes, cancer, and obesity.

- Mono- and diglycerides of fatty acids:
This additive could, in cases of high consumption, increase the risk of developing cancers and cardiovascular diseases. It is also suspected of disrupting gut flora, which could lead to an increased risk of autoimmune and allergic diseases, as well as inflammatory diseases.

Link to the Yuka product page with detailed information and scientific sources:
https://nam12.safelinks.protection.outlook.com/?
url=https%3A%2F%2Fapp.yuka.io%2FWq4UmAeqt5j4v26HA&data=05%7C02%7Cconsumers%40goya.com%7C02318d8e3ada414f73e608dd5f4f38fe%7C

I ask you to remove them in order to protect consumer health.

Cordially,

Sent from my iPhone

**Figure 16**

---

106.    In the email drafted by Defendant, and sent to Goya by a consumer, polyoxyethylene sorbitan monostearate (polysorbate 60) is described as "suspected of significantly

---

[22] Defendant references this product as "Coco Ounce Units" in its draft email, but upon information and belief the actual intended product is Goya's "Cream of Coconut."

[23] Goya has received several emails from consumers regarding polyoxyethylene sorbitan monostearate and mono- and disglycerides.

disrupting the gut microbiota, generating chronic inflammation in the intestine. This persistent inflammation weakens the immune system and could contribute to the onset of various chronic diseases such as type 2 diabetes, cancer, and obesity."

107.    However, polysorbate 60 has been recognized by FDA as a GRAS substance since 1977. Thus, 21 C.F.R. §172.836, promulgated by the FDA, provides that polysorbate 60 "may be safely used in food in accordance with . . . prescribed conditions" which include use as an emulsifier.[24] Moreover, the FDA determined that polyoxyethylene sorbitan monostearate is GRAS when used in food applications within established limits.

108.    The same email next addresses mono- and diglycerides of fatty acids and states "[t]his additive could, in cases of high consumption, increase the risk of developing cancers and cardiovascular diseases. It is also suspected of disrupting gut flora, which could lead to an increased risk of autoimmune and allergic diseases, as well as inflammatory diseases." *See* Figure 16, above, and Exhibit 16, attached.

109.    However, under 21 C.F.R. §184.1505(c), promulgated by the FDA, Mono- and diglycerides of fatty acids are "generally recognized as safe (GRAS) as a direct human food ingredient" and can be "used in food with no limitation other than current good manufacturing practice."[25]

110.    Again, these statements by Defendant that Goya's coconut products are "high-risk" to consumer health are literally false and they are significantly and potentially irreparable, to Goya's brand and reputation. In fact, Goya advertises both in stores and on its website that its

---

[24] Code of Federal Regulations, §172.836, Polysorbate 60, <https://www.eC.F.R..gov/current/title-21-chapter-I/subchapter-B/part-172/subpart-I/section-172.836> (last accessed April 3, 2025).

[25] Code of Federal Regulations, § 184.1505 Mono- and diglycerides, <https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-B/part-184/subpart-B/section-184.1505> (last accessed April 3, 2025).

coconut products are healthy and "good for you." *See* Figures 17 and 18, below, and also attached as Exhibits 17 and 18.





**Figure 17**                                **Figure 18**

111.    Defendant's false statements have misled, and continue to mislead, consumers about the safety of Goya's products, undermining the extensive marketing and advertising that Goya has undertaken to inform consumers about the health benefits of its products.

112.    Another email drafted by Defendant and sent to Goya by a consumer regarding its "Small Red Beans" product identifies silicon dioxide and monosodium glutamate (MSG) as "high-risk" additives.[26]  *See* Figure 19, below, and also attached as Exhibit 19.

---

[26] Defendants references this product as "Small Red Beans" in its draft email, but upon information and belief the actual intended product is Goya's "Small Red Beans in Sauce."

**To:**     Consumers <Consumers@goya.com>
**CC:**     copy@inbound.yuka.io
**Subject:** Small Red Beans - Goya: Request for Removal of High-Risk Additives

[You don't often get email from jenniferszakal@yahoo.com. Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

Hello,

I have scanned the product 041331020527 on the Yuka App. It contains several additives assessed as high risk.

- Silicon dioxide:
This additive may contain nanoparticles, small molecules capable of crossing the intestinal barrier, accumulating in organs, and disrupting the gut microbiota, potentially leading to inflammatory bowel diseases. By disturbing the immune response, it could, in particular, promote the onset of celiac disease in certain individuals.

- Monosodium glutamate:
This additive could increase the risk of developing various diseases in cases of high consumption: cardiovascular diseases, type 2 diabetes, metabolic disorders, overweight, and glucose intolerance. It may also cause nausea, vomiting, and migraines in certain sensitive individuals.

Link to the Yuka product page with detailed information and scientific sources:
https://nam12.safelinks.protection.outlook.com/?
url=https%3A%2F%2Fapp.yuka.io%2FX33zouzouB8U722u5&data=05%7C02%7Cconsumers%40goya.com%7Cc02bb78deedc4821f8cf08dd5c0b30a9%7C

I ask you to remove them in order to protect consumer health.

Cordially,

Sent from my iPhone

**Figure 19**

113.     Defendant describes the additive silicon dioxide with the statement that "[t]his additive may contain nanoparticles, small molecules capable of crossing the intestinal barrier, accumulating in organs, and disrupting the gut microbiota, potentially leading to inflammatory bowel diseases.  By disturbing the immune response, it could, in particular, promote the onset of celiac disease in certain individuals."

114.     However, silicon dioxide has been approved by FDA as a food additive, since at least 1977, when the agency promulgated 21 C.F.R. §172.480.  That regulation provides that the food additive silicon dioxide "<u>may be safely used in food</u>," provided it is used in accordance with certain specified conditions, including as an anticaking agent, which is how silicon dioxide is listed

on the product labeling.[27]    Accordingly, and, contrary to Defendant's false and misleading statements in its draft emails prepared for consumers, silicon dioxide may be safely used in food.

115.    Defendant next states that the additive monosodium glutamate (MSG) "could increase the risk of developing various diseases in cases of high consumption: cardiovascular diseases, type 2 diabetes, metabolic disorders, overweight, and glucose intolerance.  It may also cause nausea, vomiting, and migraines in certain sensitive individuals."

116.    However, Defendant fails to acknowledge that FDA regulations, specifically 21 C.F.R. §182, identify monosodium glutamate as an example of a common food ingredient (alongside salt, pepper, vinegar, baking powder) that is GRAS.[28]

117.    Importantly, contrary to the statements that Defendant makes to consumers, FDA regulations list monosodium glutamate among the illustrative examples of additives that are GRAS.  Monosodium glutamate is also approved as a food additive pursuant to 21 C.F.R. §172.320.

118.    These statements by Defendant that Goya's red beans products are "high-risk" to consumer health are literally false and, in this regard, are significantly and potentially irreparably harmful to Goya's brand and reputation.

119.    In yet another consumer email drafted by Defendant and sent to Goya, a consumer identifies Goya's "Foods Mojo Criollo" product and the inclusion of sodium benzoate in the product.  *See* Figure 20, below, and also attached as Exhibit 20.

---

[27]  Code of Federal Regulations, § 172.480 Silicon dioxide, <https://www.eC.F.R..gov/current/title-21/chapter-I/subpart-B/part-172/subpart-E/section-172.480> (last accessed April 3, 2025) (emphasis added).

[28]  Code of Federal Regulations, § 182.1 Substances that are generally recognized as safe, <https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-B/part-182/subpart-A/section-182.1>    (last accessed April 3, 2025).

**From:**   karen hg <matijevichkaren@hotmail.com>
**Sent on:** Saturday, March 8, 2025 5:14:00 PM
**To:**    Consumers <Consumers@goya.com>
**CC:**    copy@inbound.yuka.io
**Subject:** Foods mojo criollo - Goya: Request for Removal of a High-Risk Additive

[You don't often get email from matijevichkaren@hotmail.com. Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

Hello,

I have scanned the product 041331030601 on the Yuka App. It contains an additive assessed as high-risk (Sodium benzoate).

This additive is a preservative that could be reprotoxic, hepatotoxic, nephrotoxic, and immunotoxic. When combined with ascorbic acid, it might form benzene, a carcinogenic compound. It could also trigger intolerance reactions such as gastrointestinal issues, asthma attacks, skin reactions, and effects on the nervous system.

Link to the Yuka product page with detailed information and scientific sources:
https://nam12.safelinks.protection.outlook.com/?
url=https%3A%2F%2Fapp.yuka.io%2FnC81QA7kGTrk6CKT9&data=05%7C02%7Cconsumers%40goya.com%7Cff78f658f3ee496d8b7408dd5e64a72d%7C...
I ask you to remove it in order to protect consumer health.

Cordially,

Sent from my iPhone

## Figure 20

120.    Sodium benzoate is described as "a preservative that could be reprotoxic, hepatotoxic, nephrotoxic, and immunotoxic. When combined with ascorbic acid, it might form benzene, a carcinogenic compound. It could also trigger intolerance reactions such as gastrointestinal issues, asthma attacks, skin reactions, and effects on the nervous system."

121.    Noticeably absent from Defendant's draft email is any indication that 21 C.F.R. §184.1733(d), promulgated by the FDA, states that sodium benzoate may safely be used "in food at levels not to exceed good manufacturing practice," including at levels below 0.1 percent in food.[29]

122.    The FDA promulgated 21 C.F.R. §184.1733(d) following the issuance of a SCOGS opinion, which was based on a scientific investigation of benzoic acid and sodium benzoate. The opinion provides, in relevant part: *There is no evidence in the available information to show that*

---

[29] Code of Federal Regulations, § 184.1733(d) Sodium benzoate, < https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-B/part-184/subpart-B/section-184.1733> (last accessed April 4, 2025).

*benzoic acid and sodium benzoate as food ingredients constitute a hazard to the general public when used at levels that are now current or that might reasonably be expected in future.*[30]

123.    The false and misleading nature of Defendant's statement is laid bare by the fact of the FDA's determination that sodium benzoate is GRAS, a conclusion grounded in a scientifically backed SCOGS opinion.

124.    These statements by Defendant that Goya's red beans products are "high-risk" to consumer health are literally false and, in this regard, are significantly and potentially irreparably harmful to Goya's brand and reputation.

125.    Another example of an email drafted by Defendant and received by Goya is seen below, where the product at issue is Goya's "Sazon Goya Seasoning with Azafran."  This product includes four additives that Defendant baselessly and falsely deems as high-risk: yellow 5, red 40, tricalcium phosphate, and monosodium glutamate.  *See* Figure 21, below, and also attached as Exhibit 21.

---

[30]    Select Committee on GRAS Substances (SCOGS) Opinion: Benzoic acid, sodium benzoate, <http://wayback.archive-it.org/7993/20180124121624/https://www.fda.gov/Food/IngredientsPackagingLabeling/GRAS/SCOGS/ucm260036.htm> (last accessed April 4, 2025).

From:   Lys Smith <lyssmithnieves@gmail.com>
Sent on: Thursday, March 6, 2025 1:16:57 PM
To:     Consumers <Consumers@goya.com>
CC:     copy@inbound.yuka.io
Subject: Sazon Goya Seasoning with Azafran - Goya : Request for Removal of High-Risk Additives

You don't often get email from lyssmithnieves@gmail.com. Learn why this is important

Hello,

I have scanned the product 041331037846 on the Yuka App. It contains several additives assessed as high-risk.

- Yellow 5:
This artificial colorant is suspected of contributing to hyperactivity and attention deficit disorders in children. It could also disrupt gut microbiota and trigger intolerance reactions in sensitive individuals. Finally, excessive consumption may affect the liver, kidneys, and reproduction.

- Red 40:
This artificial coloring is suspected of contributing to hyperactivity and attention deficit disorders in children. In certain forms, it may contain aluminum, which could increase the risk of several diseases due to its accumulation in the body. Finally, it could trigger hives in sensitive individuals and disrupt the gut microbiota.

- Tricalcium phosphate:
This additive contains phosphorus, a mineral whose current intake exceeds recommendations, and whose excess could disrupt bone mineralization, have a harmful effect on the kidneys, and increase the risk of cardiovascular diseases. Additionally, it could be present in the form of nanoparticles, which may accumulate in organs.

- Monosodium glutamate:
This additive could increase the risk of developing various diseases in cases of high consumption: cardiovascular diseases, type 2 diabetes, metabolic disorders, overweight, and glucose intolerance. It may also cause nausea, vomiting, and migraines in certain sensitive individuals.

Link to the Yuka product page with detailed information and scientific sources:
https://app.yuka.io/MCSwVVnV6fkUPcAg9

I ask you to remove them in order to protect consumer health.

Cordially,

Mirnalys Smith-Nieves

**Figure 21**

126.    As discussed *supra*, Defendant made the same false and misleading statements regarding both tricalcium phosphate and monosodium glutamate in connection with Goya's Adobo with Pepper All Purpose Seasoning and Small Red Beans products. *See* ¶¶ 96-101, 112-118 & Figs. 13-14, 19. With respect to yellow 5, Defendant induced Goya's customers to state in a draft email that "[t]his artificial colorant is suspected of contributing to hyperactivity and attention deficit disorders in children. It could also disrupt gut microbiota and trigger intolerance reactions in sensitive individuals. Finally, excessive consumption may affect the liver, kidneys, and reproduction."

127.    FD&C Yellow No. 5 and FD&C Red No. 40 are "color additives," which include any dye, pigment or substance which when added or applied to a food is capable (alone or through reactions with other substances) of imparting color. 21 C.F.R. §70.3(f). Color additives are subject to prior approval by FDA. FDA has established regulations for color additives in Title 21 of the C.F.R., Parts 70-82. The regulations in 21 C.F.R. Parts 73, 74, and 82 identify each listed color

40

additive, provide chemical specifications for the color additives, and identify uses and restrictions, labeling requirements for the marketed color additive, and the requirement for batch certification.

128.    Defendant's draft email omits crucial information, namely that 21 C.F.R. §74.705, promulgated by the FDA, provides that FD&C Yellow No. 5 "may be safely used for coloring foods . . . generally in amounts consistent with good manufacturing practice."[31]

129.    Further, the FDA determined that FD&C Yellow No. 5 may be safely used for coloring foods, contrary to Defendant's statement that indicates FD&C Yellow No. 5 is a "high-risk" additive.

130.    Defendant's draft email next represents that FD&C Red 40 "is suspected of contributing to hyperactivity and attention deficit disorders in children.  In certain forms, it may contain aluminum, which could increase the risk of several diseases due to its accumulation in the body.  Finally, it could trigger hives in sensitive individuals and disrupt the gut microbiota."

131.    Similar to Defendant's omission with respect to FD&C Yellow 5, Defendant has omitted any reference to the critical fact that the FDA has promulgated interpretative guidance about this ingredient, which can be found at 21 C.F.R. §74.340, and which provides that FD&C Red No. 40 "may be safely used for coloring foods. . . generally in amounts consistent with good manufacturing practice."[32]

132.    Moreover, the FDA has determined that FD&C Red No. 40 may be safely used for coloring foods, contrary to Defendant's statement that indicates FD&C Red No. 40 is a "high-risk" additive.

---

[31] Code of Federal Regulations, § 74.705 FD&C Yellow No. 5, <https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-A/part-74/subpart-A/section-74.705> (last accessed April 3, 2025).

[32] Code of Federal Regulations, § 74.340 FD&C Red No. 40, <https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-A/part-74/subpart-A/section-74.340> (last accessed April 3, 2025).

133.    Indeed, Defendant's false statements are also contrary to the extensive advertising that Goya has undertaken to convey to consumers that Goya's products are healthy, and good for you.  As seen below, Goya often advertises in supermarkets that its Sazon Goya seasoning is "good for you."  *See* Figure 22, below, and also attached as Exhibit 22.



**Figure 22**

134.    As another example, Defendant drafted an email that a consumer sent to Goya regarding the use of phosphoric acid in Goya's "Malta Goya" product.  *See* Figure 23, below, and also attached as Exhibit 23.

**From:**    Ryan P <ziontrain102379@gmail.com>
**Sent on:** Saturday, March 8, 2025 5:13:21 PM
**To:**      Consumers <Consumers@goya.com>
**CC:**      copy@inbound.yuka.io
**Subject:** Malta Goya - Goya : Request for Removal of High-Risk Additives

> You don't often get email from ziontrain102379@gmail.com. Learn why this is important

Hello,

I have scanned the product 041331040075 on the Yuka App. It contains an additive assessed as high-risk (Phosphoric acid).

This additive contains phosphorus, a mineral whose current intake exceeds recommendations, and whose excess could disrupt bone mineralization, have a harmful effect on the kidneys, and increase the risk of cardiovascular diseases.

Link to the Yuka product page with detailed information and scientific sources:
https://app.yuka.io/H4BtFSUv4feBCscw9

I ask you to remove it in order to protect consumer health.

Cordially,

## Figure 23

135.    Phosphoric acid is described as "contain[ing] phosphorus, a mineral whose current intake exceeds recommendations, and whose excess could disrupt bone mineralization, have a harmful effect on the kidneys, and increase the risk of cardiovascular diseases."

136.    Defendant's draft email notably omits that under 21 C.F.R. §182.1073(b) phosphoric acid is "generally recognized as safe when used in accordance with good manufacturing practice."[33]

137.    As a GRAS substance, phosphoric acid was recognized as safe by FDA, following the LSRO's qualified scientists' recommendation.  In fact, the relevant SCOGS opinion provides: "There is no evidence in the available information on . . . phosphoric acid . . . that demonstrates or

---

[33] Code of Federal Regulations, § 182.1073 Phosphoric acid, https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-B/part-182/subpart-B/section-182.1073 (last accessed March 28, 2025).

suggests reasonable grounds to suspect a hazard to the public when . . . used at levels that are now current or might reasonably be expected in the future."[34]

138.    False representations such as this, especially with respect to a product that Goya has advertised as providing consumers with "better health and more energy" for over 70 years, is extremely damaging to Goya's reputation and the millions of dollars of advertising Goya has expended to market its healthy products.  *See* ¶ 20 and Figure 1, *supra,* and Exhibit 1 attached.

139.    Finally, Defendants also drafted an email that a consumer sent to Goya regarding the use of Allura Red AC in Goya's Guava Nectar product being "hazardous."  *See* Figure 24, below, and also attached as Exhibit 24.



**Figure 24**

140.    Allura Red AC is described as "suspected of contributing to hyperactivity and attention deficit disorders in children. In certain forms, it may contain aluminum, which could increase the risk of several diseases due to its accumulation in the body. Finally, it could trigger hives in sensitive individuals and disrupt the gut microbiota."

---

[34] <http://wayback.archive-it.org/7993/20171031063615/https://www.fda.gov/Food/IngredientsPackagingLabeling/GRAS/SCOGS/ucm260884.htm>

141.    As explained above with respect to Figure 27, Defendant has omitted that 21 C.F.R. §74.340, promulgated by the FDA, provides, that FD&C Red No. 40 "may be safely used for coloring foods. . . generally in amounts consistent with good manufacturing practice."[35]

142.    Indeed, as noted above, the FDA has found that FD&C Red No. 40 may be safely used for coloring foods, contrary to Defendant's statement that indicates FD&C Red No. 40 is a "hazardous" additive.

143.    Further exacerbating Defendant's deceptive practices is the fact that at times the same additive is flagged as "hazardous" and others "high-risk" for example as with FD&C Red No. 40, the Yuka App represents to consumers that it is "high-risk" in Goya's Sazon Goya Seasoning with Azafran product, and "hazardous" in Goya's Guava Nectar product.

144.    On information and belief, Defendant's own inconsistent positions on additives used in Goya products further deceives consumers.

145.    In addition to the draft language included in the email or posts composed by Defendant, consumers have in some cases added their own language to Defendant's text that further expresses frustration with Goya.  In the below example, the consumer expressly states that "[t]his is the last can I had in my [pantry] and the last one I bought. You need to care more about the consumers' health."  *See* Figure 25, below, and also attached as Exhibit 25.

---

[35] Code of Federal Regulations, § 74.340 FD&C Red No. 40, <https://www.eC.F.R..gov/current/title-21/chapter-I/subchapter-A/part-74/subpart-A/section-74.340> (last accessed April 3, 2025).

**From:**   SANDRA M. MITRO <sandramarcelah@hotmail.com>
**Sent on:** Saturday, March 29, 2025 6:35:28 PM
**To:**      Consumers <Consumers@goya.com>
**CC:**      copy@inbound.yuka.io
**Subject:** Black Bean Soup - Goya: Request for Removal of a High-Risk Additive

> You don't often get email from sandramarcelah@hotmail.com. Learn why this is important

Hello,

I have scanned the product 041331020671 on the Yuka App. It contains an additive assessed as high-risk (Monosodium glutamate).

This additive could increase the risk of developing various diseases in cases of high consumption: cardiovascular diseases, type 2 diabetes, metabolic disorders, overweight, and glucose intolerance. It may also cause nausea, vomiting, and migraines in certain sensitive individuals.

Link to the Yuka product page with detailed information and scientific sources:
https://app.yuka.io/h7DQp4gfgPEapckV9
I ask you to remove it in order to protect consumer health.

**This is the last can I had in my o a try and the last one I bought. You need to care more about the consumers' health.**


Cordially,

Sandra Mitro.

Sent from my iPhone

**Figure 25**

146.    This example is only one of many instances where a loyal Goya consumer specifically stated they would no longer purchase a Goya product as a result of Defendant's false, misleading and deceptive advertising and related harmful business practices.

147.    In fact, since November 18, 2024, Goya has received more than five hundred auto-generated emails from customers with pre-populated text prepared by Yuka with false or, at a minimum, misleading statements with respect to the health safety of Goya's products. Worse yet, these deceptive activities by Yuka are ongoing, such that Goya continues to receive approximately five such emails per day from customers as a result of Defendant's false, misleading and deceptive advertising and related harmful business practices.

148.    Defendant's actions have thus caused a significant loss of Goya's previously-expected continued business among its valued consumers and tarnished Goya's carefully curated,

46

hard earned, and decidedly deserved reputation as a leading purveyor of wholesome and healthy food products to its customers.

149.    Defendant intentionally provides this "Call-Out" feature to discourage consumers from purchasing products from Goya, a brand that without Defendant's interference, consumers would continue to purchase.

150.    However, even without explicit language from consumers stating they will no longer purchase Goya products as a result of Defendant's deceptive and unfair practices, many consumers are misled about the health information Yuca provides, often resulting in their decision to no longer purchase Goya products.

151.    Notably, Defendant does not include on its help page titled "How are food products rated?", < https://help.yuka.io/l/en/article/ijzgfvi1jq>, a disclaimer that prominently states that Yuca is only providing an opinion.  *See* ¶ 79 & Fig. 8, *supra*.

152.    Defendant only identifies its "analysis" as being an opinion in the fine print of the U.S. Terms & Conditions on its website (Fig. 26); in the fine print of its "Scoring Method" page on the Yuka App (Fig. 27); or on its webpage explaining how the "Call-Out" feature works (Fig. 28).  *See* Figures 26-28 below, and also attached as Exhibits 26-28.

**3.3.    Yuka evaluations and opinions**

The Score, which is calculated by the algorithm and assigned by the App, constitutes an **opinion** based on the analysis of the ingredients and additives that make up the Products.

**Figure 26**

The rating established by the app is an opinion given by Yuka. The adjectives "Excellent," "Good," "Poor" and "Bad" refer to this score and not to the product directly.

**Figure 27**

2.2. The designation "high risk" assigned to the concerned additives represents an **opinion** of Yuka, based on the analysis of the current state of scientific knowledge.

**Figure 28**

153.    Figures 26 through 28 show that instead of honestly advertising its services as offering "opinions" on the consumer focused pages of its website and the Yuka App, Defendant has instead buried disclaimers that its assessment is merely an opinion in the fine print of its help pages, all of which can only be discovered through an intensive search of Defendant's website.

154.    By advising U.S. consumers that certain of Goya's most popular products are "hazardous," "high-risk," "poor," or "bad" Defendant falsely represents and/or creates the false impression that Goya's products are dangerous for human consumption and that the assessment is a definitive scientific conclusion, and not simply the opinion of Defendant.  However, all of Goya's products are compliant with all federal and state food safety regulations, including FDA regulations which affirm that the additives Goya uses are safe for human consumption.

155.    Defendant intentionally advertises and provides its services to consumers about products' ratings in a way that has, in fact, and is likely to deceive consumers and create consumer confusion.

156.    Defendant's continued advertisement and display of misleading information regarding Goya's products has harmed, and continues to harm, Goya and consumers.

**D.    *Defendant's Actions Cause Injury to Plaintiff and the Public***

157.    Defendant's actions substantially harm Goya by placing false or misleading statements and damaging information about Goya products into the stream of commerce in the United States.

158.    On information and belief, Defendant knows that Goya is a top national brand with tremendous goodwill among its consumers and that its products are all compliant with U.S. federal food safety regulations.

159.    Defendant's advertisement of misleading information regarding Goya's products is likely to cause – and has caused – consumer confusion by representing to consumers that the Goya products offered for sale are "hazardous," "high-risk," "poor," and "bad" for consumer health, when the FDA has relied on scientific studies and issued regulations to determine the additives Goya uses in its products are not.

160.    Further, Defendant intentionally fails to prominently disclose that it is merely providing opinions or that Goya's products all comply with current U.S. federal food safety regulations and standards.

161.    Defendant's actions substantially harm Goya's goodwill and reputation when consumers believe Yuca's representations that Goya's products are "hazardous," "high-risk," "poor" and "bad" for consumer health.

162.    The harm being caused by Defendant in this case is not theoretical.  Specifically, consumers have complained about Defendant's false and misleading assessments to Goya via email.  *See* Section C, *supra*.

163.    Defendant's conduct as described herein results in the lessening of sales of properly advertised Goya products.

164.    As a result of Defendant's actions, Goya is suffering and will continue to suffer immeasurable damage to the enormous goodwill associated with and represented by the GOYA Marks, to Goya's longstanding relationships with its customers and to its business generally.

**COUNT I**
**Lanham Act – False Advertising**
**(15 U.S.C. § 1125(a)(1)(B))**

165.    Plaintiff hereby realleges each and every allegation set forth in the preceding paragraphs of this Complaint and incorporates them by reference.

166.    In connection with its advertising and promotion of its services through the Yuka App, Defendant has made false or misleading descriptions of fact, or misrepresentations of fact, concerning the nature, characteristics, qualities, and origin of Goya's products.

167.    By falsely identifying Goya's product ingredients as being "hazardous," "high-risk," "poor" and "bad" for consumers in the United States, Defendant has intentionally manipulated consumers into misleadingly representing that Goya's products are in fact "hazardous," "high-risk," "poor" and "bad" for consumers in the United States.

168.    In reality, Goya's products contain additives and ingredients that are all considered safe for human consumption by the relevant legal authorities and regulating agencies in the United States.

169.    As a result of Defendant's intentional misstatements and false categorization of the ingredients and additives in Goya's products, consumers are deceived and confused into believing that Goya's product ingredients are "hazardous," "high-risk," "poor" and "bad."

170.    On information and belief, because many consumers rely on the Yuka App rating system to make purchasing decisions, consumers are erroneously led to avoid purchasing Goya's

products, believing they are "hazardous," "high-risk," "poor" and "bad" when, in fact, they are not.

171.    Defendant further knowingly manipulates consumers by encouraging them to "Call out the brand" by drafting emails to Goya and posts for use with Goya's social media accounts using Defendant's own highly-technical language regarding the purported risks associated with identified product additives.

172.    As a result, consumers are deceived and confused into believing that Goya's products are in fact "hazardous," "high-risk," "poor" and "bad" and are further misled into disseminating false or misleading statements about Goya's products at the behest of Defendant.

173.    Goya has invested significant capital in developing and promoting the GOYA Marks and ensuring that all of its products align with FDA regulations to ensure the highest quality products for its consumers, and is being substantially harmed by Defendant's unfair business practices and false advertising to consumers.

174.    Defendant's publication of false and misleading statements about Goya and Goya's goods constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

175.    Defendant's publication of false and misleading statements about Goya and Goya's goods has, and is likely to deceive consumers as to the nature and quality of Goya and Goya's goods.

176.    Defendant has made false and/or misleading statements in commercial advertising regarding Goya's products.

177.    Given Defendant's widespread and national reach to current and future consumers of Goya, these false and/or misleading statements in commercial advertising regarding Goya's products influence consumers' purchasing decisions and substantially affect interstate commerce.

178.     Defendant's conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom Goya directs its marketing activities.  Defendant's false and/or misleading statements are material in that they are likely to influence consumers to purchase products from Goya's competitors and cause competitive and commercial injuries to Goya.

179.     Defendant's actions are likely to, or already have and will continue to, detrimentally impact Goya's commercial and business reputation, as well as Goya's sales of Goya's products.

180.     Defendant has made, and continues to make, its false and/or misleading statements with the intent to cause confusion and mistake, and to deceive the public as to the nature, quality, or characteristics of Goya's products and Goya's commercial activities.  Goya has been damaged as a result.

181.     As a direct and proximate result of Defendant's unlawful acts, Goya has suffered and will continue to suffer significant monetary and reputational injury in amounts to be determined at trial.

## COUNT II
### Deceptive Trade Practices Under State Law
### (N.J.S.A. §§ 56:4-1, et seq.)

182.     Plaintiff hereby realleges each and every allegation set forth in the preceding paragraphs of this Complaint and incorporates them by reference.

183.     By making false or misleading descriptions of fact, or misrepresentations of fact, concerning the nature, characteristics, qualities, and origin of Goya's products as alleged herein, Defendant has used or employed unconscionable commercial practices, deception, false pretenses, false promises, and misrepresentations in the advertisement and/or sale of the Yuka App to consumers.

184.    Defendant's use of unconscionable commercial practices, deception, false pretenses, false promises, and/or misrepresentations is likely to deceive consumers as to the nature and quality of Goya and Goya's goods.

185.    Defendant's use of unconscionable commercial practices, deception, false pretenses, false promises, and/or misrepresentations is likely to cause confusion and mistake, and to misrepresent the nature and characteristics of Goya products.

186.    Defendant's acts have caused Goya damage and will continue to cause Goya damage.

187.    Defendant has refused to desist from these wrongful acts, and therefore Defendant has indicated that it intends to continue this unlawful conduct, unless restrained by this Court.

<u>**COUNT III**</u>
**Tortious Interference with Prospective Economic Advantage Under State Law**

188.    Plaintiff hereby realleges each and every allegation set forth in the preceding paragraphs of this Complaint and incorporates them by reference.

189.    Based on its existing marketing and promotion plans, Goya had a reasonable expectation that its successful Goya products would continue to be profitable and provide the same economic advantage to Goya.

190.    Defendant was aware of the prospective economic advantage that Goya expected to continue to enjoy as a result of its thoughtful marketing plans.

191.    Defendant maliciously interfered with Goya's prospective economic advantage by intentionally misleading consumers about the nutritional value of Goya's products by making false or misleading statements about the ingredients in Goya's products.

192.    If Defendant had not unlawfully interfered with Goya's prospective economic advantage, Goya would have continued to service its existing customers, would have continued to

gain new customers, and would have continued to make increased profits from the sale of Goya products.

193.    Had it not been for Defendant's malicious interference, through the making of false and misleading statements about Goya's products, Goya would have retained or increased its consumer base, goodwill, and an untarnished reputation.

194.    As a direct and proximate result of Defendant's unlawful conduct, Goya has, in fact, not retained or increased its consumer base, goodwill, and its reputation has been tarnished.

195.    As a direct and proximate result of Defendant's wrongful interference, Plaintiff was damaged, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment in its favor and against Defendant as follows:

a. An Order declaring that Defendant's false and/or misleading statements constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B);

b. An Order declaring that Defendant's unconscionable commercial practices, deception, false pretenses, false promises, and misrepresentations constitute deceptive trade practices under the laws of the State of New Jersey;

c. An Order declaring that Defendant's conduct constitutes tortious interference with prospective economic advantage under the laws of the State of New Jersey;

d. An Order directing Defendant and its respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or affiliated with Defendant, to cease from analyzing any Goya products on the Yuka App;

e.  An Order prohibiting Defendant and its respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or affiliated with Defendant, from interfering with, undermining, attempting to interfere with or undermine Goya's prospective business relationships based on consumers' use of the Yuka App;

f.  An Order prohibiting Defendant and its respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or affiliated with Defendant, from making false or misleading statements about Goya's products to any prospective customer;

g.  That Plaintiff be awarded all other remedies available under the Lanham Act, including, but not limited to, corrective advertising;

h.  An Order requiring Defendant to pay Goya all of its litigation expenses, including reasonable attorneys' fees and the costs of this action pursuant to 15 U.S.C. § 1117 and other applicable laws;

i.  An Order requiring Defendant to pay Goya punitive damages pursuant to the Lanham Act, due to Defendants' willful and wanton behavior;

j.  An Order requiring Defendant to pay Goya punitive damages for false advertising and tortious interference with prospective economic advantage under New Jersey state and common law; and

k.  Such other relief as the Court may deem appropriate.

## JURY DEMAND

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Goya hereby demands a trial by jury with respect to all issues and claims, asserted by any party, triable of right by a jury, in the above-captioned action.

Dated: May 28, 2025

Respectfully submitted,

Brian Nolan
A. John P. Mancini*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Tel.: (212) 506 2500
BNolan@mayerbrown.com
JMancini@mayerbrown.com

* To apply *Pro Hac Vice*

*Attorneys for Plaintiff Goya Foods, Inc.*